## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

NORMAN DAWSON,

               Plaintiff,

vs.                                                Civ. No. 03-0345 JCH/LFG

ALBUQUERQUE PUBLIC SCHOOLS BOARD OF
EDUCATION and SUZANNE PARKER in her
individual and official capacities,

               Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Summary Judgment Motion of Defendants Albuquerque Public Schools Board of Education ("APS") and Suzanne Parker ("Parker") in her individual and official capacities, filed February 9, 2004 **[Doc. No. 27]**, and the Motion for Partial Summary Judgment of Plaintiff Norman Dawson ("Dawson"), filed February 9, 2004 **[Doc. No. 28]**.  The Court, having considered the motions, briefs, and relevant law, and being otherwise fully informed, finds that Defendants' Summary Judgment Motion is well taken in part and will be granted in part and that Plaintiff's Motion for Partial Summary Judgment is  not well taken and will be denied.

## BACKGROUND

Plaintiff Dawson began working for Defendant APS as an educational assistant in a classroom for students with multiple disabilities at Valley High School on October 18, 1999. Although Plaintiff Dawson is deaf, he is qualified with or without accommodation to perform the essential functions of the job of educational assistant.

Plaintiff Dawson reads lips and communicates orally and through American Sign Language.  At the time of Plaintiff's initial interview at Valley High School, Plaintiff indicated that he could read lips and communicate orally.  Plaintiff also indicated that he needed an interpreter for situations with "more people."  When discussing the circumstances under which Plaintiff required an interpreter, Plaintiff testified that he needed an interpreter with "four or five or six or more people . . . with two or more people."  Plaintiff did not need an interpreter to function in his special education classroom, which consisted of one teacher, two educational assistants, and six students.

At the time of his hire, Plaintiff was required to watch an APS training video that was not closed captioned.  The training video was the only training APS provided to educational assistants and was the orientation required by the State of New Mexico.  Plaintiff left a note with Defendant Suzanne Parker, the District Compliance Officer/Americans with Disabilities Act Coordinator, indicating that he was deaf and needed to meet with her to talk about the video and interpreters.  Defendants maintain that there is no evidence in the record that anyone at Defendant APS received such a note.  Plaintiff failed to contact anyone at Defendant APS regarding the note or Defendant Parker's failure to respond to the note.

In a letter to Marilyn Dusenberry at the ADA Compliance Office dated November 23, 1999, Plaintiff requested a qualified interpreter for a December 6, 1999, "in-service" training.  Plaintiff stated, "In requesting the need for interpreter services, . . . it is imperative I have such services for the [i]n[-s]ervice."  The Compliance Office received Plaintiff's written request and arranged for an interpreter.

Plaintiff maintains that Defendant APS had a policy of providing sign language interpreters

-2-

on request as an access accommodation.  Access accommodations do not require paperwork from employees or reasonable accommodation meetings.  It is Defendant APS's policy to handle disability accommodation requests informally at the site level through the site supervisor without the need for formalized accommodation meetings or written requests.  Defendant APS maintains, however, that policy also dictates that when, for whatever reason, accommodation issues (including access accommodation requests) are not dealt with at the site level, the ADA office formalizes the process.  Once formalized, an employee must submit a written request for accommodation, provide documentation of disability, and participate in an accommodation meeting.

In a letter to the APS Compliance Office dated December 2, 1999, Plaintiff addressed, among other things, the issue of interpreters.  Plaintiff enclosed with his December 2, 1999, letter a copy of a second letter dated November 30, 1999, that he sent to the educational assistant union referencing the failure to have a qualified interpreter at a union meeting.  In the union letter, Plaintiff stated, "I am formally requesting interpreter services for all such meetings. . . .  For me to be able to participate in a union or organization such as this, I must have the services of a 'qualified' interpreter during these meetings."  In his letter to the APS Compliance Office, Plaintiff stated, "I am writing this letter . . . to submit to you a copy of a letter I have sent to the EA Union regarding interpreters.  It basically explains itself.  You should simply be aware of the proceedings, although I would greatly appreciate your intervention, if possible."  Defendant Parker maintains that she informed Plaintiff that "union meetings were not the responsibility of the Albuquerque Public Schools and that [Plaintiff] would need to make an interpreter request to the union for their meetings."

Consistent with Plaintiff's request, the ADA Compliance Office provided Plaintiff with an interpreter for the December 6, 1999, in-service.  The Compliance Office did not ask Plaintiff to supply any information or documentation and did not require Plaintiff to attend a reasonable accommodation meeting.  The Compliance Office, however, did require Plaintiff's supervisor to verify the accommodation request.  The Compliance Office did not advise Plaintiff of any future steps he would need to take to obtain an interpreter for meetings.

A day or two after the December 6, 1999, in-service, Plaintiff met with Gloria Sanchez, Assistant Principal at Valley High School.  Ms. Sanchez was Plaintiff's site supervisor.  Ms. Sanchez knew that Plaintiff must be able to observe a speaker's lips in order to read the speaker's lips.  Ms. Sanchez also knew that it was not necessary to have a reasonable accommodation plan in order to provide Plaintiff with interpreter services.  At the meeting, Plaintiff testified that he informed Ms. Sanchez that he needed an interpreter for staff meetings and in-services, including the first staff meeting and in-service scheduled for the new year.  Defendants dispute Plaintiff's assertion that he requested an interpreter for all in-service and staff meetings, citing Ms. Sanchez's testimony that Plaintiff made no such request.

Plaintiff again met with Ms. Sanchez on January 24, 2000.  During this meeting, Plaintiff testified that Ms. Sanchez informed him that there would not be an interpreter present at an upcoming staff meeting.  Plaintiff maintains he inquired why and Ms. Sanchez indicated it was not her responsibility to provide an interpreter.  Plaintiff also maintains that Ms. Sanchez informed him that he personally would have to pay for interpreter services.

In an unsigned letter to Ms. Sanchez dated January 25, 2000, Plaintiff expressed his "disappointment and concern over the lack of interpreter services for staff meetings as evidenced

-4-

by yesterday's conversation." Plaintiff stated that Defendant APS was "responsible [for] provid[ing] [him] with interpreter services for . . . staff meetings, [i]n[-s]ervices and other functions." Plaintiff noted that he "already submitted (several weeks ago) in writing to the APS Compliance Office [a] request[ for] interpreter services for all functions related to [his] employment." Plaintiff finally asked Ms. Sanchez to "make arrangements now for [interpreters for] future staff meetings." In a second unsigned letter to Ms. Sanchez dated January 26, 2000, Plaintiff stated, "To avoid any misunderstandings in the future, this is a written request for interpreter services for the next [i]n[-]service. I believe it will be on February 7, 2000." Defendants deny receiving these two letters. Unlike all other letters exchanged between the parties, the letters were unsigned.

Defendants did not provide Plaintiff with an interpreter for the February 7, 2000, in-service, because, according to Defendants, Plaintiff never requested an interpreter. When it became apparent that an interpreter was not present, Plaintiff did not attend the in-service and instead left school prior to the end of his duty day. Plaintiff did not sign out or otherwise obtain prior approval from his immediate supervisor Ms. Sanchez. Plaintiff, however, did notify his program director that he was leaving because no interpreter was present.

Defendants claim that Valley High School has a policy that requires all staff leaving campus prior to the end of the duty day to sign out and all educational assistants leaving prior to the end of the work day to obtain prior approval from their immediate supervisors. The negotiated agreement between Defendant APS and the educational assistant union provides that educational assistants "desiring to leave the school or building location during the duty day may do so with prior notification and approval of the immediate supervisor." The agreement does not

specify that educational assistants must sign out prior to leaving.  Plaintiff was given a written

warning for leaving school without signing out or obtaining prior approval and docked pay for

time not worked.

Prior to February 7, 2000, Plaintiff complained to the APS School District and Valley

High School about Defendant APS's failure to accommodate the needs of students with severe

disabilities.  Specifically, Plaintiff complained on December 2, 1999, about the failure adequately

to seat disabled students for a school performance, and on February 1, 2000, about the

impossibility of meeting the educational and safety needs of students with disabilities given APS's

failure to supply substitutes for educational assistants.

Plaintiff contacted ADA Coordinator Defendant Parker regarding the failure to have an

interpreter at the February 7, 2000, in-service.  In a signed letter dated and sent by facsimile on

February 7, 2000, Plaintiff noted that he "repeatedly [has] requested interpreter services from [the

Compliance O]ffice as well as Ms. Gloria Sanchez at Valley."  Plaintiff indicated that he had

"written [the Compliance Office] stating the need for interpreter services," that he had "met with

Ms. Sanchez in late December to indicate . . . her responsibility to ensure interpreter services are

available for staff meetings and [i]n[-s]ervices," and that he had "spoke[n] to Ms. Sanchez a little

more than ten . . . working days prior to [the February 7, 2000, in-service]" about providing

interpreter services for the February 7, 2000, in-service.

Defendant Parker responded to Plaintiff's letter that same day, indicating that she had "no

knowledge of any communication from [Plaintiff] to request an interpreter, other than the request

[Plaintiff] made earlier in the school year for an interpreter for a union meeting."  Defendant

Parker also stated that Ms. Sanchez had requested an interpreter through her office for Plaintiff

for the November 1999 in-service.  In Defendant Parker's letter, for the first time, Defendant

Parker required Plaintiff to submit documentation proving that he was deaf and to complete a

form entitled, "Employee Request for Accommodation."

       Defendants maintain that this information was necessary because, as of February 7, 2000,

Defendant Parker formalized Plaintiff's request for accommodation.  According to Defendants,

the request was formalized at this time, pursuant to office policy, because it became clear to

Defendant Parker that Plaintiff and his site supervisor Ms. Sanchez were having disagreements

about whether Plaintiff was making requests for accommodation and Ms. Sanchez was having

difficulty understanding precisely when Plaintiff needed an interpreter.

       Plaintiff completed the APS Request for Accommodation form and returned it to the ADA

Compliance Office within approximately one week.  Plaintiff also submitted documentation

showing that he has a bilateral profound hearing loss and that he has no ability to hear speech.

       Once the process became formalized, Defendant Parker indicated that Plaintiff would be

required to attend a reasonable accommodation meeting.  The purpose of the meeting, according

to Defendant Parker, was to learn from Plaintiff and Ms. Sanchez their thoughts on Plaintiff's

needs and the potential accommodations available.  Defendants maintain that the ADA

Compliance Office's policy was to hold employee accommodation meetings outside of the duty

day so that the meetings would not interfere with instructional responsibilities associated with an

educational institution.  Plaintiff disputes this contention, arguing that Marilyn Dusenberry

testified that Defendant APS has conducted reasonable accommodation meetings during the duty

day as well as after hours.  Plaintiff also cites evidence indicating that Valley High School

employees leave the classroom during the duty day for various purposes and that the union has its

meetings during the duty day.

After receiving Plaintiff's documentation, an accommodation meeting was scheduled for February 23, 2000, at 2:40 p.m.  Plaintiff subsequently indicated in a letter to Defendant Parker dated February 17, 2000, that he expected to be compensated for meeting outside of his duty day. In a memorandum dated that same day, Defendant Parker indicated that the accommodation meeting needed to occur outside of the duty day and that Plaintiff would not be compensated for attending.  Defendant Parker informed Plaintiff that he could attend the meeting on his own time or that he could decline to meet.  Defendant Parker also indicated that it is Plaintiff's responsibility "to make a request to Ms. Sanchez . . . for each occasion when [he] anticipate[s] the need for an interpreter."

Plaintiff and Defendant Parker then exchanged a series of correspondence regarding a reasonable accommodation meeting, and Defendant Parker offered Plaintiff meeting times before 7:00 a.m. and between 2:45 p.m. and 3:30 p.m.  At one point, Plaintiff indicated that he could not meet at 7:00 a.m. anytime during the week, and that his graduate school studies prevented him from meeting after school.  Plaintiff, however, did offer in a letter dated February 23, 2000, to meet between 2:20 and 3:00 p.m., and indicated in a subsequent letter dated February 23, 2000, that he "did not entirely rule out meeting . . . at a later date at [2:45 p.m]."  In a letter dated February 27, 2000, Plaintiff also stated that he could meet anytime after 6:00 p.m. during the week as well as during Plaintiff's lunch hour.  Defendant Parker refused to meet after 6:00 p.m. or during Plaintiff's duty day.  During his deposition, Plaintiff admitted that nothing prevented him from being able to meet before or after school and that he did not want to meet during those times because he felt he should have been compensated for any meeting occurring outside of his duty

day.

The APS union contract for educational assistants provides that educational assistants are not regularly expected to work in excess of the standard duty day and that they will be provided compensatory time or overtime pay if required to do so.

No reasonable accommodation meeting took place.  Defendant APS provided interpreters for a May 3, 2000, in-service, the only other in-service held during the Spring 2000 semester. Plaintiff called in sick that day, because he did not believe that Defendant APS would provide an interpreter for the in-service.  Defendant based his belief upon Defendant Parker's statement in a memorandum dated March 29, 2000, that "[i]t is the hope of Ms. Sanchez and me that you cooperate to follow the district's ADA procedures prior to the May 3rd, 2000, in-service."  That letter also stated, "If you continue to refuse to meet unless you are paid for the time, you will be required to meet during the summer to resolve this issue before any additional accommodations are made."  In correspondence dated February 25, 2000, Defendant Parker stated that she had "attempted to convey to [Plaintiff] in past correspondence [that] the District will act upon [Plaintiff's] request when [Plaintiff is] ready to collaborate with Ms. Sanchez and [Defendant Parker]."  Plaintiff did not attempt to determine prior to calling in sick whether an interpreter would be present at the in-service.

Prior to the May 3, 2000, in-service, Plaintiff filed a charge of disability discrimination with the U.S. Equal Employment Opportunity Commission (EEOC).

During the 1999-2000 school year, a minimum of one staff meeting per month was held at Valley High School.  Defendants never provided an interpreter for Plaintiff at any of these staff meetings.  Ms. Sanchez does not have any information in her records indicating that she ever took

action to provide Plaintiff with an interpreter.

Early in the 2000 school year, Plaintiff's classroom teacher applied for a 50 percent reduction in her contract beginning in March. The teacher also informed Defendant APS that Plaintiff would be interested in filling the other half-time position. Plaintiff did not have a teaching certificate and would have to obtain a waiver to fill the position. The vice principal was informed that she first would have to contact approximately twenty-eight teachers with special education certifications before she could hire an individual who would require a waiver like Plaintiff. The vice principal began contacting the twenty-eight potential candidates, but ceased her efforts when she learned that the APS Human Resources Department denied the request for a reduction in contract.

Plaintiff was a short-term hire for the 1999-2000 school year. Once a short-term employee's contract ends (*i.e.*, at the end of a school year), that employee no longer is guaranteed employment. Plaintiff's site supervisor nonetheless recommended Plaintiff for re-hire for the 2000-2001 school year. Plaintiff chose not to return to work at Valley High School because of the unfair treatment he believed he received.

After Plaintiff filed his charge of discrimination with the EEOC, the EEOC transferred the case to the U.S. Department of Justice (DOJ). Defendants maintain that an attorney for the DOJ successfully negotiated a settlement agreement. Plaintiff disputes the existence of a signed settlement agreement. The agreement submitted by Defendants in opposition to Plaintiff's motion for summary judgment does not have a signature page. That same agreement indicates that the parties to the agreement are the United States and Defendant APS. It does not indicate that Plaintiff is a party to the agreement. Plaintiff maintains that he never approved the terms of the

-10-

settlement suggested by the DOJ.

## STANDARD

Summary judgment generally is appropriate when a court determines that "'there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law.'" *Thrasher v. B & B Chem. Co.*, 2 F.3d 995, 996 (10th Cir. 1993) (citation omitted).  Under Rule 56(c) of the Federal Rules of Civil Procedure, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* at 248.

To carry its initial burden, the moving party need not negate the nonmoving party's claim. *See Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997), *cert. denied sub nom. Smith v. Allen*, 522 U.S. 1148 (1998).  "'Instead, the movant only bears the initial burden of 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case.'"  *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law.  *See, e.g.*, *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

The standard for analyzing a motion for summary judgment shifts slightly if, as here, a

defendant raises qualified immunity as a defense.  The qualified immunity defense was created to shield public officials "from undue interference with their duties and from potentially disabling threats of liability."  *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982).  It provides immunity from suit and not merely from liability.  *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  It therefore spares defendants the burden of going forward with trial.  *See Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995) (citing *Powell v. Mikulecky*, 891 F.2d 1454, 1457 (10th Cir. 1989)).

Once a moving party raises the defense of qualified immunity, the nonmoving party must (1) assert facts which, if true, would constitute a violation of a constitutional right, and (2) demonstrate that the "right was clearly established at the time such that a reasonable person in the [movant's] position would have known that [the] conduct violated the right."  *Garramone v. Romo*, 94 F.3d 1446, 1449 (10th Cir. 1996) (citations omitted); *see also, e.g.*, *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).  If a nonmoving party fails to satisfy its two-part burden, a court must grant the moving party qualified immunity.  *See Medina*, 252 F.2d at 1128.  If the nonmoving party, however, successfully demonstrates the violation of a clearly established right, the moving party assumes the normal summary judgment burden of demonstrating that no genuine issue of material fact exists that would defeat its claim for qualified immunity.  *See Woodward v. City of Worland*, 977 F.2d 1392, 1396-97 (10th Cir. 1992) (citations omitted), *cert. denied*, 509 U.S. 923 (1993).

**DISCUSSION**

I.      __Discrimination Under Title I of the Americans with Disabilities Act.__

Title I of the Americans with Disabilities Act ("ADA") prohibits employment

discrimination on the basis of disability.  *See* 42 U.S.C. §§ 12111-17.  A *prima facie* case of

employment discrimination under the ADA requires proof that:  (1) the employee is disabled

within the meaning of the ADA; (2) the employee is qualified, with or without accommodation, to

perform the essential functions of the job held; and (3) the employee was discriminated against

because of his disability.  *See Mason v. Avaya Communications, Inc.*, 357 F.3d 1114, 1118 (10th

Cir. 2004) (citation omitted).  Here, the parties dispute only the third element of a *prima facie*

case--namely, whether Plaintiff was discriminated against because of his disability.[1]        Under

the ADA, discrimination includes "not making reasonable accommodation to the known physical

or mental limitations of an otherwise qualified individual with a disability who is an applicant or

employee, unless such covered entity can demonstrate that the accommodation would impose an

undue hardship on the operation of the business of such covered entity."  42 U.S.C. §

12112(b)(5)(A).  Thus, the ADA establishes a cause of action for disabled employees whose

employers fail reasonably to accommodate them.  *See, e.g.*, *Templeton v. Neodata Servs., Inc.*,

162 F.3d 617, 619 (10th Cir. 1998).  With respect to deaf employees, the ADA specifically

contemplates the provision of a sign language interpreter for a person who is deaf as a reasonable

accommodation.  *See* 28 C.F.R. § 35.160 and 28 C.F.R. § 35.104 ("Auxiliary aids and services"

---

[1] "Hearing" is a major life activity under the ADA.  *See* 29 C.F.R. § 1630.2(i).
Accordingly, Plaintiff is disabled within the meaning of the ADA.  The parties agree that Plaintiff
also is qualified, with or without accommodation, to perform the essential functions of the job of
educational assistant.

under Title II of the ADA include "qualified interpreters"); 28 C.F.R. § 42.503(f) ("qualified

interpreters" are an auxiliary aid included in implementing regulations of Section 504 as well); 29

C.F.R. § 1630.2(o)(ii) ("reasonable accommodation" includes "modifications or adjustments to

the work environment, or to the manner and circumstances under which the position held . . . is

customarily performed, that enable a qualified individual with a disability to perform the essential

functions of that position").

      **A.**     **<u>The February 7, 2000, In-Service</u>.**

      Plaintiff moves for summary judgment on his claim that Defendants discriminated against

him in violation of Title I of the ADA by failing to provide a sign language interpreter for the

February 7, 2000, in-service training.  The parties do not dispute that no sign language interpreter

was present at the in-service training.  The parties do dispute, however, whether Plaintiff

requested an interpreter for that in-service.

      The in-service on February 7th was a job "training" that specifically is an aspect of

employment covered under the ADA.  *See* 42 U.S.C. 12112(a) ("No covered entity shall

discriminate against a qualified individual with a disability because of the disability of such

individual in regard to . . . job training").  Plaintiff maintains that he had requested an interpreter

for all staff meetings and in-services, including the February 7, 2000, in-service.  In a letter dated

November 23, 1999, which Defendants do not dispute receiving, Plaintiff requested a qualified

interpreter for a December 6, 1999, "in-service" training.  Plaintiff argues that given Plaintiff's

request for an interpreter for the December in-service, Defendants should have assumed that

Plaintiff needed an interpreter for all meetings or, at a minimum, provided him with written notice

that he would have to re-request an interpreter for each in-service.

-14-

Plaintiff also maintains that his December 2, 1999, letter to the Compliance Office served as a request for an interpreter for all staff and in-service meetings.  In his December 2, letter, Plaintiff enclosed a copy of a second letter to the educational assistant union "formally requesting interpreter services for all such meetings."  Plaintiff's letter to the Compliance Office stated that the union letter "basically explains itself."  Defendants argue that Plaintiff's letter requested an interpreter for all union, and not all staff and in-service, meetings.

There is other (disputed) evidence in the record indicating that Plaintiff requested an interpreter for all staff and in-service meetings.  For example, Plaintiff testified that a day or two after the December 6, 1999, in-service, Plaintiff met with Ms. Sanchez and informed her that he needed an interpreter for all staff meetings and in-services, including the first staff meeting and in-service scheduled for the new year.  Plaintiff also testified that he again met with Ms. Sanchez on January 24, 2000, to discuss interpreters for staff meetings and in-services, and that Ms. Sanchez informed him that there would not be an interpreter at an upcoming staff meeting and that he personally would have to pay for his interpreter services.  Ms. Sanchez denies that Plaintiff requested interpreter services for all staff meetings and in-services.  Plaintiff also points to his January 25, 2000, and January 26, 2000, unsigned letters to Ms. Sanchez, which Ms. Sanchez claims are not in her file and that she does not recall receiving, in which Plaintiff requested that Ms. Sanchez "make arrangements now for [interpreters for] future staff meetings," and stated that "[t]o avoid any misunderstandings in the future, this is a written request for interpreter services for the next [i]n[-]service.  I believe it will be on February 7, 2000."

Summary judgment is appropriate only if there is no genuine issue of material fact in dispute and the movant is entitled to judgment in his favor as a matter of law.  Here, the parties

-15-

dispute whether Plaintiff requested an interpreter for the February 7, 2000, in-service.  Because this dispute is both genuine and material, summary judgment is not appropriate.  Accordingly, the Court denies Plaintiff's motion for summary judgment on this ground.[2]

**B.      The Reasonable Accommodation Meeting.**

The parties both seek summary judgment in their favor on Plaintiff's claim that Defendants failed to provide Plaintiff with a qualified interpreter and instead required Plaintiff to participate in a formal process that included a reasonable accommodation.  A request for accommodation triggers a responsibility on the part of an employer to enter into an interactive process with the employee, so that together they might identify the employee's precise limitations and discuss any possible accommodations that will enable the employee to continue working.  *See* 29 C.F.R. § 1630.2(o)(3).  "The federal regulations implementing the ADA 'envision an interactive process that requires participation by both parties.'"  *Templeton v. Neodata Servs.*, 162 F.3d 617, 619 (10th Cir. 1998) (quoting *Beck v. University of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)).  The interactive process requires communication and good faith exploration of possible accommodations between the employer and the employee, without delay or obstruction by either side.  *See Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114-15 (9th Cir. 2000) (citations omitted), *vacated in part on other grounds*, 535 U.S. 391 (2002).  Furthermore, "neither party should be

---

[2] Defendants also argue that one instance of failing to provide an interpreter cannot rise to the level of intentional discrimination.  Plaintiff maintains that Defendants' contention applies to damages and therefore is distinguishable.  Defendants also argue that any inference of intentional discrimination is negated by the fact that APS knew that Plaintiff was deaf when it hired him. The Court need not address these arguments because it already has held that there is a factual dispute with respect to whether Plaintiff requested an interpreter and that Plaintiff therefore is not entitled to summary judgment in his favor.

-16-

able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability." *Beck*, 75 F.3d at 1135.

In support of his motion, Plaintiff argues first that an interactive process, specifically his attendance at a formal accommodation meeting, was not necessary because his disability, and its reasonable accommodation, were obvious, and second, that if such a process was necessary, he was not responsible for its breakdown.  Defendants maintain that they did not discriminate against Plaintiff, because Plaintiff was responsible for the breakdown in the interactive process.

### 1.    The Necessity of an Interactive Process.

Plaintiff maintains that an interactive process was not necessary because his disability and reasonable accommodation were obvious.  "[T]he interpretive guidelines and courts have recognized[ that] there may be situations in which the reasonable accommodation is so obvious that a solution may be developed without either party consciously participating in an interactive process."  *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999); *see also Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165-66 (5th Cir.) (discussion of shift in employee burden when disability and limitations are not open and obvious), *cert. denied*, 117 S. Ct. 586 (1986). Accordingly, if an employee's disability and the reasonable accommodation are obvious, and if an employer refuses to provide the accommodation absent participation in an interactive process and attendance at a formal accommodation meeting, the employer's actions could constitute discrimination in violation of the ADA.  *See Loulseged*, 178 F.3d at 736.

The Court must evaluate the necessity of the interactive process on a case-by-case basis. *See id.*  Although requiring an employee to engage in an interactive process when the employee's disability and reasonable accommodation are obvious may constitute discrimination, here, a

-17-

genuine dispute of material fact exists with respect to the question whether the reasonable

accommodation was obvious.  Although it appears obvious that a hearing-impaired employee, like

Plaintiff, who has requested an interpreter for group settings (even if the employee has made some

contradictory statements about the precise size of that group setting) would require an interpreter

for staff and in-service meetings (where he would be required to "attend to multiple speakers,

distant speakers, video presentations, audience participation, etc."), Defendants contend, and cite

facts in the record in support of their contention, that they were unsure precisely under what

circumstances Plaintiff required an interpreter.  Specifically, Defendants cite evidence indicating

that Plaintiff could read lips, but that he needed an interpreter for group settings of "four or five

or six or more people,"and that he needed an interpreter for "two or more people."  Defendants

also point to evidence that Plaintiff did not need an interpreter to function in his special education

classroom, which consisted of one teacher, two educational assistants, and six students.  In

addition, Defendants claim that they were unaware whether Plaintiff actually was requesting

interpreter services, because the APS Compliance Office was receiving contradictory information.

Because a genuine issue of material facts exists with respect to the question whether the

reasonable accommodation was obvious, the Court cannot grant Plaintiff's summary judgment

motion on this ground.

2.      <strong><u>The Breakdown of the Interactive Process</u></strong>.

Plaintiff maintains that the Court can determine as a matter of law, on the facts taken in

the light most favorable to Defendants, that Defendants were responsible for the breakdown in the

interactive process.  Defendants, in contrast, argue that, on the facts taken in Plaintiff's favor,

Plaintiff was responsible for the breakdown in the interactive process.

-18-

In determining who is responsible for a breakdown in an interactive process,

> [n]o hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability.  Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary.  A party that obstructs or delays the interactive process is not acting in good faith.  A party that fails to communicate, by way of initiation or response, may also be acting in bad faith.  In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Beck*, 75 F.3d at 1135.  In discussing the interactive process, courts repeatedly have held that the process should be flexible and not formalistic.  *See id.* ("'The employer must make a reasonable effort to determine the appropriate accommodation.  The appropriate reasonable accommodation is best determined through a *flexible*, interactive process that involves both the employer and the [employee] with a disability.'") (quoting 29 C.F.R. pt. 1630, app.) (additional citations omitted); *see also Gerdes* v. *Swift-Eckrich, Inc.*, 949 F. Supp. 1386, 1405 (N.D. Iowa 1996) (citations omitted).

Here, there is a dispute in record regarding who was responsible for the breakdown in the interactive process.  Plaintiff maintains that he requested an interpreter for all in-services and staff meetings on multiple occasions.  Defendants deny that Plaintiff made such a request.  Plaintiff also contends that his request for an interpreter for the December 6, 1999, in-service should have indicated that he needed an interpreter for all in-services, and that requiring him to make a formal request for each in-service was overly formalistic and a breach of Defendants' obligation to engage in a good faith interactive process.  Plaintiff further maintains that Defendants' requirement that he participate in a formal accommodation meeting was overly formalistic and

-19-

therefore caused a breakdown in the interactive process.[3]  Defendants claim that they needed the

formal accommodation meeting because they did not understand when, and under what

circumstances, Plaintiff was requesting interpreter services.  Defendants also maintain that

Plaintiff refused to meet.  Plaintiff, however, claims that he should not have been required to meet

outside his duty day, and that even though this requirement was inappropriate, he proposed

meeting times outside of his duty day that Defendant Parker refused to accept.  A genuine issue of

material fact exists with respect to who caused the breakdown in the interactive process, and the

Court cannot determine as a matter of law that either Plaintiff or Defendants are entitled to

judgment in their favor.  The Court therefore denies the parties' motions for summary judgment

on this ground.

### 3.      **Meeting Outside the Duty Day.**

Plaintiff also argues that requiring him to meet outside the duty day without compensation

constitutes a condition of employment contrary to the ADA and Section 504.  Specifically,

Plaintiff argues that by requiring him to meet such a condition in order to receive his federally

guaranteed right of access--*i.e.*, his right to an interpreter to have access to workplace training--

by coming in after work for an accommodation meeting, Defendant APS treated Plaintiff

---

[3] The Court notes that "[t]he [ADA] regulations direct an employer to engage in an *informal* process."  *Loulseged*, 178 F.3d at 736.  Defendant APS's policy, however, is to formalize the process when, for whatever reason, accommodation issues are not dealt with at the site level.  Once formalized, an employee must submit a written request for accommodation, provide documentation of disability, and participate in an accommodation meeting.  The ADA regulations and EEOC compliance manual, however, mandate an informal process and provide that "requests for reasonable accommodations do not need to be in writing."  2 EEOC Compliance Manual, Enforcement Guidance for Psychiatric Disabilities, at 21; *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999); *Loulseged*, 178 F.3d at 736.

differently from non-disabled employees in violation of federal law.  According to Plaintiff, the mere existence of this policy is discriminatory as a matter of law.  Plaintiff concedes, however, that he was unable to find any law in support of his claim that requiring an employee to attend an accommodation meeting outside of the duty day constitutes a *per se* violation of the ADA and Rehabilitation Act.  Accordingly, this Court cannot grant Plaintiff's motion for judgment in his favor as a matter of law.

Rather, whether a policy that is part of the interactive process envisioned by the ADA-- such as the reasonable accommodation meeting required by Defendant APS--violates the ADA depends upon whether that policy caused a breakdown in the interactive process.   As this Court already has explained, there is no hard and fast rule to determine who is responsible for the breakdown in an interactive process.  Courts must look for signs of failure to participate in good faith in the interactive process.  Plaintiff has argued that Defendants are responsible for the breakdown in the interactive process because they instituted the overly-formalistic requirement of attendance at an accommodation meeting outside the duty day.  Because a genuine issue of material fact exists with respect to the question who is responsible for the breakdown in the process, Plaintiff is not entitled to judgment in his favor on this claim.

II.     **Discrimination Under Title II of the Americans With Disabilities Act and Section 504 of the Rehabilitation Act.**

Plaintiff also moves for summary judgment on his public entity claims against Defendant APS.  Title II of the ADA and Section 504 of the Rehabilitation Act apply to Defendant APS as a

local public school district that receives federal funding.[4]  Title II of the ADA commands that "no

qualified individual with a disability shall, by reason of such disability, be excluded from

participation in or be denied the benefits of the services, programs, or activities of a public entity,

or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Section 504 of the

Rehabilitation Act prohibits discrimination against disabled persons who are otherwise qualified

for participation in programs receiving federal funds.  *See* 29 U.S.C. § 794(a); *see also Swenson*

*v. Lincoln Co. Sch. Dist.*, 260 F. Supp. 2d 1136, 1144 (D. Wyo. 2003).

        In order to state a claim under Title II of the ADA and the Rehabilitation Act, Plaintiff

must prove that: (1) he is a qualified individual with a disability; (2) he was excluded from the

benefits or services of a public entity or otherwise was discriminated against by the public entity;

and (3) such exclusion, denial of benefits, or discrimination was because of his disability.[5]  *See*

*Gohier v. Enright*, 186 F.3d 1216, 1219 (10th Cir. 1999).  The parties do not dispute that

Plaintiff is a qualified individual with a disability.  Rather, the parties dispute only whether Plaintiff

was excluded from participation in or denied the benefits of its services, programs, or activities, or

---

        [4] A "public entity" includes any special purpose district or other instrumentality of the state
or local government.  *See Swenson v. Lincoln Co. Sch. Dist.*, 260 F. Supp. 2d 1136, 1144 (D.
Wyo. 2003) (citation omitted); 42 U.S.C. § 12131(1).  A school district is a "public entity."  *See*
*Swenson*, 260 F. Supp. 2d at 1144.

        [5] To state a claim for disability discrimination under the Rehabilitation Act, a plaintiff must
prove the same elements required to prevail under Title II of the ADA.  *See Swenson*, 260 F.
Supp. 2d at 1144-45 (citing *Nielsen v. Moroni Feed Co*., 162 F.3d 604, 608 n.7 (10th Cir.
1998)); *see also DeBord*, 126 F.3d at 1104-05 (Congress intended Title II and its implementing
regulations to be consistent with the Rehabilitation Act and its regulations) (citations omitted);
*Baird v. Rose*, 192 F.3d 462, 468-69 (4th Cir. 1999) (Congress has instructed that interpretation
of Title II of the ADA and Section 504 of the Rehabilitation Act be coordinated to prevent
imposition of inconsistent or conflicting standards for the same requirements' under the two
statutes) (citations omitted).

otherwise discriminated against by reason of his disability.

Three theories of discrimination are available to Plaintiff: (1) intentional discrimination; (2) discriminatory impact; and (3) a refusal to make a reasonable modification.[6]  *See Swenson*, 260 F. Supp. 2d at 1144; *see also Tsombanidis v. City of West Haven*, 180 F. Supp. 2d 262, 283 (D. Conn. 2001).  Plaintiff argues that Defendant APS discriminated against him by failing to make a reasonable modification.

As this Court already has held, a genuine issue of material fact exists with respect to whether Defendant APS failed to make a reasonable modification for Plaintiff.  *See supra* § I.A, B.  Among other things, the parties dispute whether Defendant APS failed to provide Plaintiff with an interpreter at the February 7, 2000, in-service.  Although Plaintiff maintains that he requested an interpreter for all in-service and staff meetings, Defendants dispute this contention.  Because a factual dispute exists with respect to whether Defendant APS discriminated against Plaintiff by failing to accommodate him, the Court cannot grant judgment as a matter of law in Plaintiff's favor.

## III.    Retaliation Under the Americans with Disabilities Act and Rehabilitation Act.

The ADA provides that "it shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . any right granted or protected by this Act." 42 U.S.C. § 12203(b).  To establish a *prima facie* case of retaliation under the ADA and

---

[6] Title II of the ADA uses the term "reasonable modification," whereas Title I of the ADA uses the term "reasonable accommodation."  *Swenson*, 260 F. Supp. 2d at 1144 n.10. "Notwithstanding the different statutory language, there appears to be little substantive difference between the terms."  *Id.*; *see also Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 816 n.26 (9th Cir. 1999).

Rehabilitation Act, Plaintiff must prove:  (1) that he engaged in protected activity; (2) that he was subjected to an adverse employment action contemporaneous with or subsequent to the protected activity; and (3) a causal link between the adverse action and the protected activity.[7]  *See Selenke v. Medical Imaging*, 248 F.3d 1249, 1264 (10th Cir. 2001).  If Plaintiff establishes all three factors, the burden shifts to Defendants to articulate a nondiscriminatory reason for the adverse employment action.  *See id.*  If Defendants satisfy this burden of production, and not persuasion, Plaintiff, in order to prevail, must "prove that the employer's reason for the adverse action 'is pretextual, i.e., unworthy of belief.'"  *Id.* (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1177 (10th Cir. 1999)).

### A.    Retaliation By Formalizing Plaintiff's Request for Reasonable Accommodation.

Plaintiff moves for summary judgment on his retaliation claim based upon the formalization of his request for a reasonable accommodation.  Specifically, Plaintiff maintains that after he complained about Defendant APS's failure to provide him with an interpreter and advocated for students with disabilities, Defendant APS retaliated against him by requiring him to

---

[7] Cases interpreting ADA and Rehabilitation Act are effectively interchangeable.  *See supra* note 5; *Allison v. Dep't of Corr.*, 94 F.3d 494, 497 (8th Cir. 1996) (explaining that because the same basic standards and definitions are used under the ADA and Rehabilitation Act, cases interpreting either are applicable and interchangeable) (citations omitted); *Baird*, 192 F.3d at 468 (setting forth a single statement of the elements of ADA and Rehabilitation claims, and acknowledging the general principle that "'because the language of the two statutes is substantially the same, we apply the same analysis to both'") (quoting *Doe v. University of Md. Medical Sys. Corp*, 50 F.3d 1261, 1264 n.9 (4th Cir. 1995)); *Nielson v. Moroni Feed Co.*, 162 F.3d 604, 608 n.7 (10th Cir. 1998) (noting that the ADA enlarges the scope of the Rehabilitation Act to cover private employers, but explaining that the legislative history of the ADA indicates that Congress intended judicial interpretation of the Rehabilitation Act to be incorporated by reference when interpreting the ADA).  Accordingly, the Court analyzes Plaintiff's ADA and Rehabilitation Act retaliation claims under the same standard.

submit paperwork and attend an accommodation meeting when such formal requirements were unnecessary to secure an interpreter for in-service and staff meetings.  In response, Defendant APS argues first that Plaintiff cannot establish that he suffered an adverse employment action, and that Defendant therefore is entitled to judgment as a matter of law in its favor, and second that Defendant APS had a legitimate, non-discriminatory reason for its action and that Plaintiff cannot demonstrate that the reason was pretextual.

With respect to its first argument, Defendant APS maintains when Plaintiff was asked to go through the formal ADA accommodation process, he suffered no change in tenure, pay, or other benefit.  Defendant APS also maintains that Plaintiff was free to attend the reasonable accommodation meeting or refuse to attend the meeting and that he was not retaliated against but rather given a good evaluation and recommended for rehire.  In reply, Plaintiff argues that Defendant APS "ignore[s] the undisputed fact[] that provision of interpreters to others was automatic," and that "lack of access to the meetings, being 'required' to meet after hours to secure the accommodations to which he was entitled under the law," and "essentially having to beg and jump through hoops simply to obtain what should have been provided to him was a significant alteration of the 'terms, conditions and privileges of employment.'"

The Tenth Circuit has stated, in the context of retaliation claims under Title VII, that "[r]etaliatory conduct other than discharge or refusal to rehire is . . . proscribed . . . only if it alters the employee's 'compensation, terms, conditions, or privileges of employment,' or 'adversely affect[s] his status as an employee.'"  *Sanchez v. Denver Public Schs.*, 164 F.3d 527, 533 (10th Cir. 1998) (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)).  "It follows that 'not everything that makes an employee unhappy' qualifies as retaliation, for

-25-

'otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'" *Id.* (quoting *Robinson*, 120 F.3d at 1300). Instead, the Tenth Circuit has looked for actions that have some impact on a plaintiff's employment status. *See id.* ("[c]ourts considering the issue have held that unsubstantiated oral reprimands and unnecessary derogatory comments such as those alleged here are not included within the definition of adverse action absent evidence that they had some impact on the employee's employment status") (citations and internal quotations omitted). Other circuit courts likewise have held that an adverse employment action must affect a plaintiff's future employment prospects. *See, e.g.*, *Robinson*, 120 F.3d at 1301 (adverse employment action requirement met by showing that retaliatory conduct was related to plaintiff's future employment and was serious enough materially to alter his or her future employment prospects or conditions) (citations omitted); *Ruedlinger v. Jarrett*, 106 F.3d 212, 214 (7th Cir. 1997) (providing information to subsequent employer that caused it to fire plaintiff constitutes retaliation that "impinges on her 'future employment prospects or otherwise has a nexus to employment'" and therefore meets the adverse employment action requirement) (quotation omitted); *Passer v. American Chem. Soc'y*, 935 F.2d 322, 331 (D.C. Cir. 1991) (holding under parallel provision of the ADEA that defendant's retaliatory cancellation of a seminar planned in honor of plaintiff gave rise to retaliation claim because the cancellation humiliated plaintiff in the eyes of his peers "and made it more difficult for him to procure future employment").[8]

---

[8] *See also Smith v. St. Louis Univ.*, 109 F.3d 1261, 1266 (8th Cir. 1997) (negative references causing potential employers to decline to hire plaintiff constitute actionable retaliation); *Sherman v. Burke Contracting, Inc.*, 891 F.2d 1527, 1532 (11th Cir.) (retaliation claim proper where plaintiff's former employer persuaded plaintiff's new employer to fire him), *cert. denied*,

Here, the Court cannot grant summary judgment in Plaintiff's favor because Plaintiff cannot establish that Defendant APS engaged in an adverse employment action by formalizing Plaintiff's ADA request for accommodation. Formalizing Plaintiff's request had no effect on Plaintiff's job status or future employment prospects. Indeed, Plaintiff was given a good evaluation and recommended for rehire the following school year. Because the formalization of Plaintiff's reasonable accommodation request does not as a matter of law constitute an adverse employment action, Plaintiff is not entitled to judgment in his favor on his retaliation claim. Because Plaintiff's motion is denied on this ground, the Court need not address Defendant APS's second argument that it had a legitimate, non-discriminatory reason for its formalization of the accommodation request.[9]

**B.     Retaliation by Failing to Hire Plaintiff as a Teacher.**

Defendant APS seeks summary judgment in its favor on Plaintiff's retaliation claim based upon APS's failure to hire Plaintiff as a teacher. Defendant APS argues, among other things, that

---

498 U.S. 443 (1990). *Compare Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466-67 (2d Cir. 1997) ("barring a terminated employee from using an office and phone to conduct a job hunt presents only a minor, ministerial stumbling block toward securing future employment" and thus did not constitute adverse employment action under parallel provisions of the ADEA).

[9] The Court also need not address Defendants's argument that the Court should deny Plaintiff's motion for summary judgment in its entirety on the ground that all of Plaintiff's claims are barred by a prior settlement agreement. An aggrieved party is precluded from bringing a civil lawsuit only if the EEOC enters into settlement agreement to which the person aggrieved is a party or if the EEOC files a civil action. *See* 42 U.S.C. § 2000e-5(f)(1); *see also EEOC v. Braum*, 347 F.3d 1192, 1201 (10th Cir. 2003). The parties dispute, however, whether such agreement existed and whether Plaintiff was a party to it. The Court need not determine, however, whether Plaintiff's claims are barred by the alleged prior settlement agreement, because the Court already has denied Plaintiff's motion on other grounds.

it had a legitimate, non-discriminatory, and non-pretextual reason for denying Plaintiff the position as a teacher--*i.e.*, namely that the position Plaintiff sought never existed.  Although Plaintiff's classroom teacher indicated that she wanted a reduction in contract, the APS Human Resources Department denied the teacher's request.  Plaintiff questions why the request was denied, implying that the request was denied for a discriminatory reason.  Plaintiff's only evidence in support of this contention is that the vice principal began calling licensed teachers as part of the interview process for the position, which, according to Plaintiff, indicates that the vice principal believed the request would be granted.  Plaintiff also maintains that a factual dispute exists because the motivation for denying the request is unknown.

Defendant APS has satisfied its burden of production, and not persuasion, by setting forth a legitimate, non-discriminatory reason for its failure to hire Plaintiff as a teacher.  Plaintiff, in order to prevail, must now prove that Defendant APS's reason for the adverse action is pretextual or unworthy of belief.  Plaintiff, however, has set forth no evidence to satisfy his burden.  Plaintiff's sole contention that the teacher's request for a reduction in contract was denied for a discriminatory reason, and his only evidence in support of this contention is that the vice principal began calling licensed teachers.  This fact alone, however, is insufficient to prove pretext.  Accordingly, the Court grants Defendant APS's motion for summary judgment on the retaliation claim based upon the failure to hire Plaintiff for the teaching position.

### C.   **Retaliation by Reprimanding Plaintiff for Leaving Campus.**

Defendant APS argues that it likewise had a legitimate, non-discriminatory reason for disciplining Plaintiff for leaving campus without notifying his immediate supervisor or signing out, and that Defendant APS therefore is entitled to summary judgment on this ground.  According to

Defendant APS, Valley High School has a policy of requiring all staff leaving campus prior to the end of the duty day to sign out and all educational assistants leaving prior to the end of the work day to obtain prior approval from their immediate supervisors.  The agreement between Defendant APS and the educational assistant union requires educational assistants to notify and obtain prior approval of their immediate supervisors before leaving work during the duty day.  Because Plaintiff violated Defendant APS's policy, Plaintiff was given a written warning and docked pay for time not worked.

The ADA does not require an employer to ignore misconduct.  *See Breiland v. Advance Circuits*, 976 F. Supp. 858, 865-66 (D. Minn. 1997); *see also Harris v. Polk County*, 103 F.3d 696, 697 (8th Cir. 1996) (agreeing with other courts of appeal that an employer may hold disabled employees to the same standards of conduct as non-disabled employees).  It is undisputed that Plaintiff left campus on February 7, 2000, without notifying his immediate supervisor or signing out.  Defendant APS's contention that Plaintiff was reprimanded as a result of his failure to comply with school policy constitutes a legitimate, non-discriminatory reason for its employment action.

Now that Defendant APS has satisfied its burden, Plaintiff must prove that Defendant APS's reason for the adverse employment action is pretextual.  Plaintiff argues, but does not cite any facts in support of his argument, that it is "unclear what APS's/Valley High School's policy [with respect to leaving work during the duty day] even was."  Plaintiff also argues that he did notify his program director, but not his immediate supervisor, prior to leaving.  These arguments are insufficient to establish pretext.  Accordingly, the Court grants Defendant APS's motion for summary judgment on this ground.

Plaintiff's citation to *EEOC v. Wal-Mart*, 187 F.3d 1241 (10th Cir. 1999), in which the Tenth Circuit upheld a punitive damages award in an ADA discrimination and retaliation case, does not persuade this Court otherwise. In *Wal-Mart*, the employer knew the plaintiff was hearing impaired and that he would need an interpreter in training sessions. When the plaintiff refused to attend a training session that he could not understand without an interpreter, his supervisors not only failed to provide an interpreter, they transferred the plaintiff from his job as a receiving associate to a janitorial position. The next day, the supervisors again failed to provide the plaintiff with an interpreter to discuss his transfer and, in fact, suspended him when he objected to a perceived demotion. When Wal-Mart did provide an interpreter one week later, it was to inform the plaintiff of his termination. The store manager, who ultimately approved the suspension, was familiar with the accommodation, discrimination, and retaliation requirements of the ADA. The Tenth Circuit held that, based upon this evidence, a reasonable jury could have concluded that Wal-Mart intentionally discriminated against the plaintiff. *See id.* at 1246.

*Wal-Mart* is distinguishable on several grounds. *Wal-Mart* came before the Tenth Circuit on the question whether the court should affirm a punitive damages award. In this case, the question before the Court is whether Defendant APS has set forth a legitimate, non-discriminatory, non-pretextual reason for its action of reprimanding Plaintiff. Moreover, in *Wal-Mart*, the plaintiff was reprimanded in a manner that affected his job status and future employment prospects--*i.e.*, he was transferred (and arguably demoted) to a janitorial position--for his failure to attend a training session because an interpreter was not present. Here, Plaintiff was reprimanded in a manner that did not affect his job status or future employment prospects--*i.e.*, he was given a good evaluation and recommended for rehire--for his failure to follow school policies

-30-

of signing out and notifying his immediate supervisor prior to his departure.

The Court also notes that Defendant APS is entitled to summary judgment in its favor on a different ground--namely, that reprimanding Plaintiff for leaving campus does not, as a matter of law, constitute an adverse employment action. As described herein, an adverse employment action must affect an employee's job status and/or future employment prospects. *See supra* III.A. Giving Plaintiff a written warning and docking Plaintiff's pay for time not worked do not constitute adverse employment actions because those actions did not affect Plaintiff's job status or future employment prospects. *See, e.g.*, *Sweeney v. West*, 149 F.3d 550 (7th Cir. 1998) (plaintiff's claims that she unfairly was reprimanded for conduct she should not have been responsible for did not constitute an adverse employment action absent some tangible job consequence accompanying those reprimands); *Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996) (negative performance evaluations, standing alone, cannot constitute an adverse employment action, but could constitute evidence of discrimination). To the contrary, Plaintiff was given a good evaluation and recommended for rehire. Accordingly, the Court grants Defendant APS's summary judgment motion on this ground as well.

### D.    Retaliation by Constructive Discharge.

Defendant APS finally seeks summary judgment on Plaintiff's claim that "the hostility and roadblocks [that Plaintiff] encountered in simply solidifying his right to an interpreter resulted in generalized and specific adverse employment action." Plaintiff maintains that he "could not reasonably choose to continue with APS and move toward his 'dream job' of a teacher there under the intolerable and demeaning work conditions," and that these "intolerable demeaning circumstance[s]" were akin to constructive discharge. A generalized and allegedly intolerable and

-31-

demeaning work environment does not constitute an adverse employment action. *See Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 533 (10th Cir. 1998) ("[c]ourts considering the issue have held that 'unsubstantiated oral reprimands and unnecessary derogatory comments' such as those alleged here are not included within the definition of adverse action absent evidence that they had some impact on the employee's employment status"); *McDonnell v. Cisneros*, 84 F.3d 256, 258 (7th Cir. 1996) (implying in dicta that "anger, irritation, dirty looks, even the silent treatment can cause distress" but do not constitute materially adverse employment action). Although Plaintiff alleges that he did not return to his job as a result of the allegedly intolerable conditions, Plaintiff choose not to return to his job, and a choice made by Plaintiff to leave his job--even if that choice was motivated by an allegedly intolerable and demeaning work environment--does not constitute an adverse employment action by Defendant APS. Accordingly, Defendant APS is entitled to summary judgment in its favor.[10]

## IV.   Equal Protection Under the Fourteenth Amendment.

### A.   Summary Judgment on the Merits.

Defendants move for summary judgment on Plaintiff's equal protection claim, arguing that Defendant APS's policy of holding request for accommodation meetings outside of the duty day does not violate Plaintiff's right to equal protection under the law.[11]  "The Equal Protection

---

[10] Defendant APS also argues that Plaintiff's retaliation claims must fail because Plaintiff cannot establish a causal link between the allegedly protected activity and any adverse employment action. The Court, however, need not consider this argument because it has granted Defendant's motion for summary judgment on other grounds.

[11] Defendants also move for summary judgment on the ground that APS's policy of distinguishing between informal and formal accommodation requests does not violate Plaintiff's right to equal protection. Plaintiff, however, in response to the motion, does not set forth any

Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)); *see also Thompson v. Colorado*, 278 F.3d 1020, 1031 (10th Cir. 2001), *cert. denied*, 535 U.S. 1077 (2002). "An equal protection violation occurs when the government treats someone differently than another who is similarly situated" and there is no rational basis for the difference. *Penrod v. Zavaras*, 94 F.3d 1399, 1406 (10th Cir. 1996) (citation omitted); *Garcia v. State Univ.*, 280 F.3d 98, 109 (2d Cir. 2001) (the Equal Protection Clause proscribes only government conduct for which there is no rational relationship between the disparity and some legitimate governmental purpose).

Defendants maintain that APS has a rational basis for its policy of holding request for accommodation meetings outside the duty day--namely, achieving the efficient handling of disability accommodation requests while ensuring the smallest interruption to the educational needs of students. Plaintiff cites evidence in the record, however, indicating that union meetings and teacher disciplinary actions occur during the duty day. To date, Defendants have not provided the Court with any evidence of a rational basis for this distinction. Accordingly, a genuine issue of material fact exists with respect to the question whether holding accommodation meetings outside of the duty day is necessary to ensure that Defendant APS meets the educational needs of students. The Court therefore must deny Defendants' motion for summary judgment on

---

specific facts showing that there is a genuine issue for trial with respect to this claim. Because Plaintiff has not satisfied his summary judgment burden, the Court grants Defendants' summary judgment motion on the equal protection claim based upon APS's policy of distinguishing between formal and informal accommodation requests.

Plaintiff's equal protection claim based upon APS's stated policy of holding accommodation meetings outside the duty day.

Defendants' arguments to the contrary do not persuade the Court otherwise. First, Defendants argue that the Constitution does not prohibit unfair, unjust, or reprehensible policies, and that it only prohibits discriminatory policies. Defendants maintain that Plaintiff cannot show that Defendant APS's policies reflect purposeful discrimination and are not rationally related to their stated purpose. As the Supreme Court has explained, "In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Dandridge v. Williams,* 397 U.S. 471, 485 (1970) (quoting *Lindsley v. Natural Carbonic Gas Co*., 220 U.S. 61, 78 (1911)). Accordingly, "'A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.'" *Id.* (quoting *McGowan v. Maryland*, 366 U.S. 420, 426 (1961)). As this Court already has held, however, a genuine issue of material fact exists with respect to whether Defendants' stated justification for holding accommodation meeting outside of the duty--*i.e.*, preserving teaching time--when other non-teaching-related meetings are held during the duty day is rationally related to a legitimate governmental purpose. Defendants therefore are not entitled to judgment in their favor.

Second, Defendants argue that Plaintiff's equal protection claim is not supported by the evidence because there is "no evidence in the record suggesting that disabled persons receive[] their discipline at a different time or in a different manner than their non-disabled peers," or that

-34-

"the disabled educational assistants ha[ve] their union meeting at one time . . . [and] non-disabled educational assistants me[e]t at a different time."  Defendants' argument misses the mark. Plaintiff does not claim that Defendants treat disabled union members differently from non-disabled union members or that Defendants treat disabled employees subject to disciplinary action differently from non-disabled employees subject to disciplinary action.  Rather, the crux of Plaintiff's argument is that Defendants treat employees seeking protection under the ADA differently from other similarly-situated employees in that Defendant APS requires employees seeking a work-related accommodation under the ADA to meet outside the duty day but does not require employees to meet for other work-related (but non-teaching related) activities, such as union meetings or disciplinary actions, outside the duty day.  Defendants' argument, therefore, does not have merit.

**B.    Summary Judgment on the Ground of Qualified Immunity.**

Defendant Parker moves for summary judgment on Plaintiff's equal protection claim on the ground that she is shielded by qualified immunity.  In evaluating a qualified immunity defense, a court first must determine whether the plaintiff sufficiently has alleged the violation of a constitutional right and second must determine whether the right was clearly established such that a reasonable official in the defendant's position would have known that her conduct violated that right.  *See Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 516 (10th Cir. 1998).  Defendant Parker concedes that Plaintiff has asserted a violation of a constitutional right.  Therefore, the only issue before this Court is whether that right was clearly established.

"'[T]he right [Defendant Parker is] alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense:  The contours of the right

must be sufficiently clear that a reasonable official would understand that what [s]he is doing violates that right.'" *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001) (quoting *Anderson v. Creighton*, 483 U.S. 635 (1987)).  Therefore, "the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that h[er] conduct was unlawful in the situation . . . confronted." *Id.* (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).  The Tenth Circuit has held that "[t]he law is clearly established when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains." *Roska v. Peterson*, 328 F.3d 1230, 1248 (10th Cir. 2003).  That is not to say, however, that "the very action in question [must have] previously been held unlawful" for a plaintiff to defeat qualified immunity, *Anderson v. Creighton*, 483 U.S. 635, 640 (1987), but rather that in light of preexisting law, the unlawfulness was apparent.

The Tenth Circuit and Supreme Court have recognized that a state violates the Equal Protection Clause if it makes distinctions between the disabled and nondisabled without a rational justification.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (holding that state legislation making classifications based upon mental retardation must be rationally related to a legitimate city interest); *Martin v. State of Kansas*, 190 F.3d 1120, 1128 (10th Cir. Aug. 19, 1999) (recognizing that the Supreme Court in *Cleburne* held that arbitrary discrimination by the state against disabled persons violates the Equal Protection Clause).  Accordingly, in the fall of 1999 and spring of 2000, Plaintiff's right to be free from arbitrary discrimination was sufficiently clear that a reasonable official should have understood that making arbitrary, baseless distinctions between employees seeking accommodations under the ADA and

-36-

other similarly situated employees would violate the Fourteenth Amendment.  Defendant Parker

therefore is not entitled to qualified immunity with respect to Plaintiff's equal protection claim,

and the Court denies Defendant Parker's motion for summary judgment on this ground.

## CONCLUSION

For the reasons stated above, **IT THEREFORE IS ORDERED** that the Summary

Judgment Motion of Defendants Albuquerque Public Schools Board of Education ("APS") and

Suzanne Parker ("Parker") in her individual and official capacities, filed February 9, 2004 **[Doc.**

**No. 27]**, is hereby GRANTED IN PART as follows, and that the Motion for Partial Summary

Judgment of Plaintiff Norman Dawson ("Dawson"), filed February 9, 2004 **[Doc. No. 28]**, is

hereby DENIED as follows:

1.    Plaintiff's Motion for Summary Judgment on his claim under Title I of the ADA that Defendants discriminated against him by failing to provide him with a sign language interpreter for the February 7, 2000, in-service training, is denied;

2.    Plaintiff's Motion for Summary Judgment on his claim under Title I of the ADA that Defendants discriminated against him by formalizing his request for accommodation under the ADA is denied;

3.    Plaintiff's Motion for Summary Judgment on his claim under Title I of the ADA that Defendants discriminated against him by causing the breakdown of the interactive process is denied;

4.    Defendants' Motion for Summary Judgment on Plaintiff's claim under Title I of the ADA that Defendants discriminated against him by causing the breakdown of the interactive process is denied;

5.    Plaintiff's Motion for Summary Judgment on his claim under the ADA and Rehabilitation Act that Defendant APS's policy of holding accommodation meetings outside of the duty day without compensation constitutes a *per se* violation of the ADA and Rehabilitation Act is denied;

6.    Plaintiff's Motion for Summary Judgment on his claim under Title II of the ADA and Section 504 of the Rehabilitation Act that Defendant APS discriminated

against him by failing reasonably to accommodate him is denied;

7.      Plaintiff's Motion for Summary Judgment on his claim under the ADA and
        Rehabilitation Act that Defendants retaliated against him by formalizing the request
        for accommodation process is denied;

8.      Defendants' Motion for Summary Judgment on Plaintiff's claim under the ADA
        and Rehabilitation Act that Defendants retaliated against him by failing to hire
        Plaintiff as a teacher is granted;

9.      Defendants' Motion for Summary Judgment on Plaintiff's claim under the ADA
        and Rehabilitation Act that Defendants retaliated against him by reprimanding
        Plaintiff for leaving campus is granted;

10.     Defendants' Motion for Summary Judgment on Plaintiff's claim under the ADA
        and Rehabilitation Act that Defendants retaliated against him by constructively
        discharging him is granted;

11.     Defendants' Motion for Summary Judgment on Plaintiff's claim that Defendants
        violated his right to equal protection under the Fourteenth Amendment by
        adopting a policy whereby request for reasonable accommodation meetings are
        held outside of the duty day is denied;

12.     Defendants' Motion for Summary Judgment on Plaintiff's claim that Defendants
        violated his right to equal protection under the Fourteenth Amendment by
        distinguishing between informal and formal accommodation requests is granted;
        and

13.     Defendant Parker's Motion for Summary Judgment on the ground of qualified
        immunity with respect to Plaintiff's claim that Defendant Parker, in her individual
        capacity, violated Plaintiff's right to equal protection under the Fourteenth
        Amendment by enforcing a policy of requiring request for reasonable
        accommodation meetings to be held outside of the duty day is denied.


Dated this 23rd day of August 2005.


                                        _____
                                        JUDITH C. HERRERA
                                        UNITED STATES DISTRICT JUDGE

Attorneys for Plaintiff:
        Gail Stewart, Esq.


-38-

Attorneys for Defendants:
            Max I. Madrid, Esq.
            Alex C. Walker, Esq.